Exhibit A

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

2012 NOV -9 PM 3: 13

CIRCUIT COURT OF CO. IL
CO. NT...
LAW DIV...

PLAY BEVERAGES, LLC and
CIRTRAN BEVERAGE CORP.,

                 Plaintiffs,

vs.

PLAYBOY ENTERPRISES INTERNATIONAL,
INC., JIMMY ESEBAG, UNITED LICENSING
GROUP, INC., RON COOPERSMITH, RLC
PARTNERS, LLC, REDI FZE and
PAUL LEVIN,

                 Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 2012L012181

Honorable Lynn M. Egan

## AMENDED COMPLAINT

Play Beverages, LLC ("**PlayBev**") and CirTran Beverage Corp. ("**CirTran**"), through their counsel, hereby complain against Defendants Playboy Enterprises International, Inc. ("**Playboy**"), Jimmy Esebag, United Licensing Group, Inc. ("**ULG**"), Ron Coopersmith, RLC Partners, LLC, Redi FZE, and Paul Levin (collectively referred to as "**Defendants**") as follows:

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff PlayBev is a limited liability company that is engaged in the business of manufacturing, selling, promoting, and distributing a non-alcoholic energy drink known as the Playboy Energy Drink. PlayBev is a debtor-in-possession under Chapter 11 of the Bankruptcy Code, having consented to the entry of an order of relief on August 12, 2011.

2.     Plaintiff CirTran is a Utah corporation that has contracted with PlayBev to obtain certain rights to manufacture and distribute the Playboy Energy Drink.

3.     Defendant Playboy is a corporation with its principal places of business in the State of California. At all times relevant to this action, Playboy has been the owner of the "Playboy" name and rabbit head design that is commonly recognized as the Playboy trademark.

Exhibit A  Page 5

4.      Defendant Jimmy Esebag is an individual residing in the State of California and a principal of defendant ULG.  At all times relevant to this action, Mr. Esebag has been retained by PlayBev to act as its authorized "broker," pursuant to the terms of a written letter agreement between PlayBev and Esebag dated March 3, 2010 (the "**Letter Agreement**").

5.      Defendant ULG is a corporation with its principal place of business in the State of California.  At all times relevant to this action, ULG has acted as an authorized agent of Playboy pursuant to a formal agency agreement.  ULG currently holds itself out on its website as the "worldwide licensing agent for PLAYBOY ENTERPRISES."

6.      Defendant RLC Partners, LLC is a limited liability company with its principal place of business in Washington D.C.  At all times relevant to this action, RLC Partners has been retained by PlayBev to act as its authorized "broker," pursuant to the terms of a written Broker Agreement between PlayBev and RLC Partners dated June 1, 2009.

7.      Defendant Ron Coopersmith is an individual who is believed to reside in Washington D.C.  At all times relevant to this action, Mr. Coopersmith has been a principal of defendant RLC Partners.

8.      Defendant Redi FZE is a Dubai limited liability company that conducts business in multiple international markets.  At all times relevant to this action, Redi FZE has been an authorized distributor of the Playboy Energy Drink in the United Kingdom and other countries, pursuant to a written Manufacturing and Distribution Agreement dated June 3, 2010.

9.      Defendant Paul Levin is a principal of Redi FZE, and is believed to be a resident of London, England.

10.      Jurisdiction is proper in the State of Illinois under 735 ILCS 5/2-209 because Defendants undertook acts including:

Exhibit A Page 6

a)  doing and transacting business within the State of Illinois;

b)  making and performing contracts which are substantially connected to the State of Illinois; and

c)  committing tortious acts within the State of Illinois.

11.  Venue is proper in Cook County under 735 ILCS 5/2-101 because some parts of the causes of action stated herein arose there and all defendants are non-residents of Illinois.  In addition, a venue selection clause in the contract between Plaintiffs and Defendant Playboy calls for litigation in Cook County.  See Exhibit 1 at § 14.

12.  An actual case or controversy has arisen between the parties.  PlayBev has been injured by Defendants' conduct.

## GENERAL ALLEGATIONS

13.  On or about November 1, 2006, Playboy and PlayBev entered into a License Agreement pursuant to which PlayBev was granted the right to distribute the Playboy Energy Drink in certain enumerated territories, either directly or by sub-contracting its manufacturing and distribution rights to a third-party (the "**License Agreement**"), a copy of which is attached hereto as Exhibit 1.  Pursuant to Section 1(b) of the License Agreement, the License was effective for up to twenty years, beginning with an initial five year term and renewing for three additional five-year terms thereafter.

14.  On or about August 21, 2007, PlayBev and CirTran entered into an Amended and Restated Exclusive Manufacturing, Marketing and Distribution Agreement under which CirTran was granted certain manufacturing and distribution rights under the License Agreement.  A copy of this agreement is attached hereto as Exhibit 2.  Playboy was aware of and approved of this agreement and intended that through this agreement, CirTran would directly benefit under the License Agreement as the principal manufacturer and distributor of the Playboy Energy Drink.

3

Exhibit  A   Page  7

15.     PlayBev and CirTran have invested significant funds and resources into developing and promoting the Playboy Energy Drink in reliance upon the License Agreement and its Amendment. PlayBev literally started its business from scratch, as Playboy did not have any other energy drinks on the market at the time the License Agreement was entered into and did not have any established networks to manufacture or distribute a beverage product. Plaintiffs formulated the product from a proprietary blend of ingredients, obtained the necessary government approvals to manufacture and sell the product across a variety of international markets, and recruited international distributors and sub-licensees to manufacture, promote, and sell the product in several different countries.

16.     PlayBev and CirTran have developed expansive distribution channels to distribute, market, and sell the Playboy Energy Drink. During the last four years, PlayBev and CirTran have successfully grown the network to a point where they have launched the product into more than 30 countries and have obtained distributors for more than 80 countries.

17.     The License Agreement requires that all distribution agreements that the Plaintiffs enter into be approved by Playboy. In order to expand the product distribution network and promote the Playboy Energy Drink world-wide, CirTran has entered into numerous distribution agreements with entities located in countries around the world.

18.     Playboy has received, reviewed, and approved each of CirTran's distribution agreements and retains the right to terminate these distribution agreements. Accordingly, Playboy has intended and repeatedly acknowledged the contractual relationship between CirTran and its international distributors, and the benefits under the License Agreement that run to CirTran. Conversely, Playboy has approved of and directly benefited from the distribution

4

Exhibit $A$ Page $8$

system established and created by CirTran, as it has obtained a profit stream and international brand recognition through this network.

19.     Plaintiffs provided copies of each of the distributors' contracts to Playboy prior to entering into the distribution agreement, and is the express named beneficiary of the distribution agreements.

20.     Playboy can terminate the distribution agreements if breached, require the Plaintiffs to terminate the agreement, or sue the distributors directly. Playboy, however, has not terminated or brought suit against the distributors because the distributor agreements and the distribution system created by Plaintiffs in reliance on the License Agreement are valuable assets that benefit Playboy.

21.     Playboy is aware that many of the distribution agreements have terms extending beyond the duration of PlayBev's initial five-year license term. Playboy has periodically provided letters of assurance to Plaintiffs for use in negotiating their distributor agreements, in which it has represented to prospective distributors that PlayBev's license was in good standing.

22.     Playboy has also specifically authorized PlayBev and/or CirTran to enter into sub-license agreements in certain markets where it would be cost-prohibitive for PlayBev to directly manufacture and/or market the product. In particular, Plaintiffs have requested permission to enter into sub-license arrangements in countries that have unique regulatory requirements or excessive tariffs that make it cost-prohibitive for a foreign corporation to manufacture a beverage. In each such instance, Plaintiffs have provided prior notice of the identity of the proposed sub-licensee as well as the terms of the proposed contract, and has obtained Playboy's approval prior to entering into any agreement.

Exhibit A Page 9

23.     Despite its best efforts, PlayBev did not achieve certain Minimum Net Sales that were set forth in the License Agreement.  Playboy knew that PlayBev did not achieve the Minimum Net Sales, but Playboy did not declare PlayBev to be in default, and did not seek to terminate the License Agreement for failure to meet Minimum Net Sales.  Rather, Playboy represented to PlayBev that the Minimum Net Sales provision would not be invoked because Playboy appreciated that PlayBev had made significant progress in developing the market for the Playboy Energy Drink in that it had expanded its distribution Territory and revenues.

24.     PlayBev's position with respect to Minimum Net Sales was also further confirmed during a meeting between Playboy Senior Executive Sarah Haney and three of PlayBev's representatives, which occurred in Las Vegas, Nevada in March 2011.  At the time of this meeting, Ms. Haney was Playboy's Senior Vice-President of Global Licensing and was PlayBev's primary contact with respect to the License Agreement.  During the meeting, PlayBev's representatives expressed their concerns about the ability to continue to develop the product and market in light of the upcoming expiration of the License Agreement.  In particular, PlayBev's representatives stressed that it would be difficult to recruit new distributors or achieve its target sales goals if the License Agreement would be terminated the following year.

25.     In response to these specific concerns, Ms. Haney represented that: (i) Playboy intended to negotiate the renewal of PlayBev's license prior to the expiration of the initial term; (ii) Playboy would accept quarterly payments of PlayBev's Guaranteed Royalties in satisfaction of any monetary obligations; and (iii) Minimum Net Sales would never be an issue from Playboy's perspective as long as PlayBev continued to develop its Territory and expand its distribution network.  Ms. Haney further encouraged PlayBev to continue to develop its Territory

by recruiting new distributors, and has issued letters of good standing in order to facilitate the Plaintiffs' expansion.

26.     Consistent with Ms. Haney's prior representations, Playboy agreed to expand PlayBev's territory through subsequent amendments to the Licensing Agreement on several additional occasions in 2009, 2010, and 2011, despite PlayBev's alleged failure to achieve Net Minimum Sales.

27.     Plaintiffs relied upon Ms. Haney's representations as an authorized agent of Playboy acting with apparent authority of the company, and further relied upon Playboy's commitment in expanding the Territory.   Among other things, Plaintiffs recruited new distributors for its newly added Territory and entered into contracts that extended far beyond the expiration of the initial license term.   Plaintiffs fully disclosed each of these agreements to Playboy, and Playboy has benefited from the ongoing income stream and brand development efforts of these distributors.

28.     PlayBev has worked cooperatively with Playboy in order to protect the Playboy brand in its marketing of the Playboy Energy Drink.   Section 4(b) of the License Agreement acknowledges that Playboy is the owner of the trademark and that it has "the sole and absolute discretion [to] decide whether to assert any claim or [to] undertake or conduct any suit with respect to … infringement or imitation of the mark."   Nevertheless, PlayBev has historically cooperated in reporting any instances of potential infringement for purposes of assisting Playboy in policing its mark.

29.     Likewise, Section 2(h) of the License Agreement requires PlayBev to obtain prior written approval for any products or material bearing Playboy's trademark and to submit samples of its materials to Playboy prior to each use.   Consistent with this obligation, Plaintiffs have

Exhibit A Page 11

historically required all distributors and sub-licensees to present any promotional materials or artwork for Playboy's approval prior to using the mark, and has diligently investigated any allegations of misuse.

30.     Although Playboy and Plaintiffs worked cooperatively for over four years in developing the Playboy Energy Drink Product line, Playboy abruptly changed its practices when a new management team took over in the spring of 2011.   In particular, Playboy's new management teamed proved to be far less cooperative when dealing with PlayBev with respect to its requests for approval to use the Playboy mark at various marketing events and far less cooperative in negotiating payment arrangements for royalties owing under the License Agreement.

31.     Unbeknownst to Plaintiffs, Playboy had already decided that it would not be renewing its License Agreement with PlayBev and had been actively taking measures as early as April 2011 to locate a replacement licensee.

32.     More specifically, Playboy began working with Mr. Jimmy Esebag and Mr. Ron Coopersmith during the spring of 2011 in order to cut Plaintiffs out of their energy drink distribution network.   At the time Playboy engaged in this conduct, both Mr. Esebag (individually) and Mr. Coopersmith (through his company, RLC Partners) were under contract with PlayBev and were being compensated by PlayBev to provide assistance in promoting PlayBev's products and in developing its distribution network.

33.     By April of 2011, Mr. Esebag had reported to Playboy that he had located two potential alternative licensees to replace PlayBev as the exclusive licensee for the Playboy Energy Drink: (i) an entity located in the United Kingdom known as Redi FZE, which was actually an active distributor of CirTran and was subject to a non-circumvention agreement; and

Exhibit A Page 12

(ii) an unknown group of individuals who were referred to internally by Mr. Esebag and Playboy as "the Russians."

34.     Playboy did not disclose to Plaintiffs that it had entered into negotiations with alternative licensees, and did not disclose to PlayBev that its brokers were attempting to secure an alternative licensee.   To the contrary, Playboy actually encouraged Plaintiffs to invest additional funds and resources into its distribution network in order to better position themselves for the next license renewal period.  Indeed, Playboy was negotiating a proposed payment plan with PlayBev for payment of Guaranteed Royalties while simultaneously authorizing Mr. Esebag to proceed forward with the Russian group.

35.     Likewise, Playboy was also informed of and encouraged Mr. Esebag to meet with his alternative licensees in Los Angeles in mid-April 2011 in order finalize terms before meeting with Playboy executive management.  At the same time, Playboy adopted a back-up plan to offer PlayBev a payment extension if Mr. Esebag's alternative deal "fell through."

36.     By May 2011, Playboy executives Sarah Haney and Markus Grindel had committed to a course of action that would replace PlayBev as its exclusive licensee.   In particular, Playboy was interested in Mr. Esebag's alternative licensees because at least one of the groups was willing to agree to a larger guaranteed royalty payment than that provided by PlayBev under the License Agreement.

37.     Significantly, Playboy was simultaneously asking PlayBev to make an additional royalty payment of approximately $1.8 million, even though Playboy planned to declare PlayBev in default once one of Mr. Esebag's alternative licensee placed its sufficient funds into escrow to demonstrate its commitment to the proposed deal.

Exhibit A Page 13

38.     By May 2011, Playboy had also entered into formal negotiations with Paul Levin, the principal of Redi FZE, in order to have Redi FZE replace PlayBev as the exclusive licensee for the Playboy Energy Drink.  Playboy's negotiations with Redi FZE were facilitated by Messrs. Esebag and Coopersmith, who introduced Playboy to Redi FZE and conveyed information and prospective deal terms between the parties.

39.     Playboy, Esebag, Coopersmith, and Levin all knew and understood that Redi FZE was still under contract with CirTran at the time their negotiations were occurring and knew that Redi FZE's distribution contract contained non-circumvention provisions.  Moreover, both Playboy and Redi FZE knew that it was actionable for Redi FZE and Playboy to enter into negotiations while PlayBev's License Agreement remained in effect.  Upon information and belief, Redi FZE's counsel had advised that the parties' negotiations were tortious, and conveyed this opinion in communications with Playboy representative Judy Kawal.

40.     Nevertheless, Playboy and Redi FZE commenced negotiations anyway and began exchanging draft license agreements on May 26, 2011, just three days after Redi FZE's counsel had warned them that such conduct would be tortious.

41.     Playboy anticipated that Redi FZE would take over the expansive distribution network that had been constructed by PlayBev and CirTran from scratch, and in fact, encouraged Redi FZE to do so.  On June 1, 2011, Playboy representative Judy Kawal represented to Redi FZE's counsel that Playboy would terminate PlayBev once Redi FZE finalized its agreement with Playboy.  Ms. Kawal further represented that Playboy would require PlayBev to terminate is distributors so that the distributors could enter into a direct contract with Redi FZE.

42.     Upon information and belief, Playboy also began working closely with Redi FZE, in order to assist that distributor in breaching its distribution contract with CirTran.  Among other

10

things, Redi FZE's counsel had been in contact with Playboy executive Judy Kawal during the Spring of 2011 and had obtained her cooperation in pursuing a lawsuit in Third District Court in Salt Lake County. Redi FZE's counsel also sought a declaration from Ms. Kawal in support of a motion aimed towards excusing Redi FZE from making certain royalty payments owing under its distribution agreement. Redi FZE then used Ms. Kawal's representations as a pretext for withholding approximately $1 million in royalty payments, which in turn, compromised PlayBev's ability to meet its payment obligations to Playboy.

43. To make matters worse, Playboy refused to bring claims against Redi FZE for unauthorized use of the Playboy marks after Redi FZE's distribution agreement was terminated for non-payment. Upon information and belief, Playboy did not pursue claims against Redi FZE because it planned to install Redi FZE as a replacement licensee once PlayBev was terminated.

44. Playboy also engaged in direct communications with distributors and sub-licensees for purposes of obstructing Plaintiffs' efforts to obtain royalties that were needed to satisfy PlayBev's monetary obligations to Playboy under the License Agreement. While the full extent of Playboy's activities are not yet known, internal Playboy correspondence demonstrates that Playboy had attempted to compile a worldwide list of the Plaintiffs' international distributors in order to send notice to the distributors that Playboy would be declaring PlayBev in breach of its agreement.

45. In addition, Playboy actually sent a notice to distributors on July 14, 2011 in which it declared that PlayBev was in breach of its agreement and that Playboy was in the process of having the License Agreement terminated. Playboy's communication was unsolicited and intended to disrupt the distributor network by creating unnecessary concern and uncertainty among the distributors.

11

46.     Upon information and belief, Playboy also authorized Mr. Esebag to respond to inquiries from distributors, to hold himself out as an agent or representative of Playboy and to represent that he was "in charge of the Playboy Energy Drink License." At least one South American distributor immediately began withholding payments, citing Mr. Esebag's statements as its basis for doing so. Other distributors have subsequently followed suit, and have refused to pay royalties as a result of the cloud placed by the Defendants on PlayBev's license.

47.     The initial term of the License Agreement expired on March 31, 2012. Playboy has refused to honor the renewal term of the License Agreement; however, the parties have formally extended the License Agreement on two separate occasions in order to accommodate the negotiation of a new License Agreement.

48.     On October 15, 2012, Playboy provided written notice that it now considers the License Agreement to be expired and that PlayBev has no continuing license rights. Playboy has refused to negotiate any further extensions of the License Agreement.

## FIRST CAUSE OF ACTION
### (Breach of Contract – PlayBev and CirTran v. Playboy)

49.     Plaintiffs incorporate the allegations set forth above.

50.     The License Agreement is a valid and binding contract that grants PlayBev an exclusive License to utilize the Playboy mark for purposes of manufacturing, distributing, promoting, and selling the Playboy Energy Drink.

51.     The License Agreement provides that PlayBev's license is renewable for up to 20 years. The long-term duration of the License Agreement is a material term of the contract, which the Plaintiffs relied upon in developing their products, developing their distribution networks, and furthering the product brand.

Exhibit A Page 16

52.     CirTran is an intended beneficiary of the License Agreement.  Playboy knew and intended that CirTran, in reliance upon the agreement, would develop a distribution network for the Playboy Energy Drink.  Playboy knew of and approved the Amended and Restated Exclusive Manufacturing, Marketing and Distribution Agreement under which CirTran was granted certain manufacturing and distribution rights under the License Agreement.  Consistent with the parties' understanding that CirTran was an intended beneficiary of the License Agreement, CirTran sought and obtained Playboy's approval to contract with each of its distributors for purposes of promoting and selling the Playboy Energy Drink.

53.     PlayBev has fully performed under the License Agreement, or in the alternative, was excused from certain obligations as a result of Playboy's affirmative representations, tortious conduct, and/or efforts to obstruct PlayBev's performance.  Playboy's wrongful acts include, but are not necessarily limited to:

a)      Attempting to secure alternative licensees during the term of PlayBev's exclusive license;

b)      Conspiring with Jimmy Esebag, Ron Coopersmith, Paul Levin, and Redi FZE in order to cut Plaintiffs out of their energy drink distribution network in favor of an alternative licensee;

c)      Failing to disclose to Plaintiffs that it had entered into negotiations with alternative licensees while simultaneously encouraging Plaintiffs to invest additional funds and resources into their distribution network in order to better position themselves for the next license renewal period;

d)      Failing to disclose to Plaintiffs that it had entered into negotiations with alternative licensees while simultaneously negotiating a proposed payment plan with PlayBev for payment of additional Guaranteed Royalties;

e)      Entering into formal negotiations with Redi FZE, a known distributor of Plaintiffs, in order to replace PlayBev as the licensee for the Playboy Energy Drink;

f)      Representing to Redi FZE that Playboy would require Plaintiffs to terminate its distributor relationship so that Redi FZE could engage in direct relationships with the Plaintiffs' existing distribution network;

13

g) Assisting Redi FZE in breaching its distribution contract and cooperating with Redi FZE in its lawsuit in Third District Court in Salt Lake County, thereby impairing PlayBev's ability to meet its payment obligations;

h) Refusing to bring claims against Redi FZE for unauthorized use of the Playboy marks after Redi FZE's distribution agreement was terminated for non-payment;

i) Refusing to issue cease and desist notices to unauthorized users of the Playboy mark who were using the Playboy mark, images, and brand to promote competing energy drink products;

j) Inhibiting PlayBev's ability to meet its sales targets by endorsing competing products and brands;

k) Communicating with distributors and sub-licensees for purposes of obstructing Plaintiffs' efforts to obtain royalties that were needed to satisfy PlayBev's monetary obligations to Playboy under the License Agreement;

l) Authorizing Mr. Esebag to respond to inquiries from distributors, and to hold himself out as being "in charge of the Playboy Energy Drink License";

m) Threatening to terminate the License Agreement in bad faith in order to take over the distribution network that was constructed from scratch;

n) Threatening to terminate the License Agreement without good cause and without providing PlayBev with a reasonable opportunity to cure;

o) Informing distributors and sub-licensees of its intent to terminate the License Agreement while the automatic stay remained in effect;

p) Demanding payment for advance royalties through March 2012 when Playboy had already concluded that it would be terminating PlayBev's license; and

q) Inducing under false pretenses a payment by PlayBev of $500,000 for the right to use the Playboy mark through March 2012 without any intention of allowing PlayBev to do so.

54.     Playboy does not have grounds to terminate the License Agreement, but instead, is terminating the agreement in order to improperly replace PlayBev as the licensee and to take over the Plaintiffs' distribution network.  Playboy intends to terminate the License Agreement, regardless of PlayBev's ability to comply with the terms of the License Agreement.

Exhibit A Page 18

55.     The termination of the license will damage Plaintiffs, as they will lose the right to use the Playboy mark, and will become entirely disassociated from the Playboy brand.  Further, Plaintiffs will be unable to develop their Territory or realize the value of the time, money, and resources that were devoted towards the development of their Territory and the Playboy Energy Drink.

56.     Plaintiffs are entitled to damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
**(Breach of the Implied Covenant of Good Faith and
Fair Dealing – PlayBev and CirTran v. Playboy)**

57.     Plaintiffs incorporate the allegations set forth above.

58.     The License Agreement, like all contracts, contains an implied covenant of good faith and fair dealing, the breach of which gives rise to damages.

59.     Playboy has breached the implied covenant of good faith and fair dealing by exercising its contractual discretion in bad faith.  In particular, Playboy has breached the covenant of good faith and fair dealing, by refusing to renew the License Agreement in bad faith and by unreasonably withholding its approvals of marketing efforts and promotional activities.

60.     Plaintiffs have been damaged by Playboy's breach of the implied covenant, and are entitled to damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
**(Tortious Interference with Contract – PlayBev and CirTran v. Playboy)**

61.     Plaintiffs incorporate the allegations set forth above.

62.     Plaintiffs contract with various distributors and sub-licensee who manufacture, distribute, promote, and/or sell the Playboy Energy Drink pursuant to written distribution agreements that were approved by Playboy.  Plaintiffs' network of distributors, sub-licensees,

and business contacts is a unique and irreplaceable asset on which the survival of Plaintiffs' business depends.

63.    Playboy is aware of PlayBev's agreement with CirTran and CirTran's agreements with various international distributors.  Playboy expects Plaintiffs to develop and exploit these business relationships in order to promote and sell the Playboy Energy Drink.  Playboy has also materially benefited from the increased royalties paid by Plaintiff from the revenue generated from the Plaintiffs' distribution agreements and business relationships.

64.    Playboy has interfered with Plaintiffs' relationships with its distributors and sub-licensees.  Playboy's tortious acts include, but are not necessarily limited to:

a)    Entering into formal negotiations with Redi FZE, a known distributor, in order to replace PlayBev as the licensee for the Playboy Energy Drink;

b)    Representing to Redi FZE that Playboy would require a termination of the distributor relationship so that Redi FZE could engage in direct relationships with Plaintiffs' distribution network;

c)    Assisting Redi FZE in breaching its distribution contract with CirTran and cooperating with Redi FZE in its lawsuit against PlayBev in Third District Court in Salt Lake County;

d)    Communicating with distributors and sub-licensees for purposes of obstructing PlayBev's efforts to obtain royalties that were needed to satisfy PlayBev's monetary obligations to Playboy under the License Agreement;

e)    Authorizing Mr. Esebag to respond to inquiries from distributors, and to hold himself out as being "in charge of the Playboy Energy Drink License"; and

f)    Informing distributors and sub-licensees of its intent to terminate PlayBev's License Agreement.

65.    Playboy has engaged in the foregoing conduct with an improper purpose and for improper means.  Specifically, Playboy has engaged in this course of conduct so that it can either

Exhibit A Page 20

take over Plaintiffs' expansive product distribution network business, or in the alternative, transfer that network to an alternative licensee who is willing to pay higher royalties to Playboy.

66.     Playboy's conduct has interfered with Plaintiffs' distribution network and inhibited PlayBev's ability to meet and cure its monetary obligations under the License Agreement.

67.     Playboy's termination of the License Agreement will necessarily cause Plaintiffs to breach their distribution agreements with their distributors and sub-licensees, which will likely result in claims, litigation and/or other exposure.

68.     Plaintiffs are entitled to damages for Playboy's tortious conduct in an amount to be proven at trial, and which is believed to be in excess of several million dollars.

69.     Playboy's conduct was intentional, willful, and malicious, such that Plaintiffs are also entitled to punitive damages from Playboy in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
**(Civil Conspiracy – PlayBev and CirTran v. Playboy, Jimmy Esebag, United Licensing Group, Inc., Ron Coopersmith, RLC Partners, LLC, Redi FZE, and Paul Levin)**

70.     Plaintiffs incorporate the allegations set forth above.

71.     Plaintiffs contract with various distributors and sub-licensee who manufacture, distribute, promote, and/or sell the Playboy Energy Drink pursuant to written distribution agreements that were approved by Playboy.  Plaintiffs' network of distributors, sub-licensees, and business contacts is a unique and irreplaceable asset on which the survival of Plaintiffs' business depends.

72.     Defendants are aware of the Plaintiffs' agreements and have encouraged the Plaintiffs to enter into distributor relationships for purposes of selling and promoting the Playboy Energy Drink.

73.     Defendants have agreed to accomplish the unlawful purpose of interfering with Plaintiffs' relationships with its distributors and sub-licensees. Defendants' have agreed to accomplish their unlawful purpose through unlawful means, including, but not necessarily limited to:

a)     Facilitating and entering into formal negotiations between Playboy and the other Defendants to replace PlayBev as the licensee for the Playboy Energy Drink;

b)     Planning an improper, early termination of the distributor relationship so that Defendants could engage in direct relationships with Plaintiffs' distribution network;

c)     Assisting Redi FZE in breaching its distribution contract with PlayBev and cooperating with each other in Redi FZE's lawsuit against PlayBev in Third District Court in Salt Lake County;

d)     Communicating with distributors and sub-licensees for purposes of obstructing PlayBev's efforts to obtain royalties that were needed to satisfy PlayBev's monetary obligations to Playboy under the License Agreement;

e)     Authorizing Mr. Esebag to respond to inquiries from distributors, and to hold himself out as being "in charge of the Playboy Energy Drink License"; and

f)     Informing distributors and sub-licensees of Playboy's intent to terminate the License Agreement.

74.     Defendants have engaged in the foregoing conduct with an improper purpose and for improper means. Specifically, they have engaged in this course of conduct so that they can either take over Plaintiffs' expansive product distribution network business, or in the alternative, transfer that network to an alternative licensee who will pay higher royalties to Playboy.

75.     Defendants' conspiracy has interfered with Plaintiffs' distribution network and inhibited PlayBev's ability to meet and cure its monetary obligations under the License Agreement.

Exhibit A Page 22

76.     Plaintiffs are entitled to damages for Defendants' conspiracy in an amount to be proven at trial, and which is believed to be in excess of several million dollars.

77.     Defendants' conduct was intentional, willful, and malicious, such that Plaintiffs are also entitled to punitive damages from Defendants in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION
**(Promissory Estoppel – PlayBev and CirTran Against Playboy)**

78.     Plaintiffs incorporate the allegations set forth above.

79.     In March 2011, Playboy represented to Plaintiffs that it would renew PlayBev's license prior to the expiration of the initial term, accept quarterly payments of PlayBev's Guaranteed Royalties, and waive PlayBev's requirement for Minimum Net Sales as long as PlayBev continued to develop its Territory and expand its distribution network.   These representations were made by Sarah Haney, the Senior Vice-President of Global Licensing who acted with the actual or apparent authority of the company.

80.     The representations made by Playboy and its agents constituted a promise which Playboy should have reasonably expected to induce action on the part of Plaintiffs.

81.     Plaintiffs did, in fact, rely upon Playboy's representations and have taken action in reliance upon those representations.   Among other things, Plaintiffs have recruited new distributors for its expanded Territory and entered into contracts that extended far beyond the expiration of the initial license term.   Plaintiffs fully disclosed each of these agreements to Playboy, and Playboy has benefited from the ongoing income stream and brand development efforts of these distributors.

82.     Injustice will result if Playboy's promises are not enforced.

83.     As the result of Playboy's failure to act as promised, PlayBev has been damaged in an amount to be proven at trial.

Exhibit A Page 23

## SIXTH CAUSE OF ACTION
### (Injunctive Relief – PlayBev and CirTran Against Playboy)

84.     Plaintiffs incorporate the allegations set forth above.

85.     The License Agreement is a valid and binding contract that grants PlayBev an exclusive License to utilize Playboy mark for purposes of manufacturing, distributing, promoting, and selling the Playboy Energy Drink.

86.     The License Agreement provides that PlayBev's license is renewable for up to 20 years.  The long-term duration of the License Agreement is a material term of the contract, which the Plaintiffs relied upon in developing their products, developing their distribution networks, and furthering the product brand.

87.     CirTran is an intended beneficiary of the License Agreement.  Playboy is aware of CirTran's contract with PlayBev, and is further aware of CirTran's efforts to establish, develop, and expand the network of distributors for the Playboy Energy Drink.  Playboy materially benefits from CirTran's efforts and has obtained revenue as a result of CirTran's efforts.

88.     Playboy has refused to honor the renewal term of the License Agreement and has provided written notice that PlayBev has no continuing rights under the License Agreement. Playboy has refused to negotiate any further extensions of the License Agreement.

89.     Plaintiffs will be irreparably harmed by the improper termination of the License Agreement, as they will lose the right to use the Playboy mark, will become entirely disassociated from the Playboy brand, and will lose the benefits of the distribution networks they have built.   Absent injunctive relief, those distribution networks would be impossible to reassemble in their current form.  Plaintiffs will also be exposed to claims from their distributors and vendors, who have relied upon the License Agreement in developing the market and Playboy Energy Drink brand.  Thus, Plaintiffs have no adequate remedy at law.

Exhibit A  Page 24

90.    Plaintiffs are entitled to a preliminary injunction and permanent injunction enjoining Playboy, and all persons or entities acting on its behalf, from terminating PlayBev's License Agreement during the pendency of this lawsuit.

## SEVENTH CAUSE OF ACTION
### (Breach of Contract – PlayBev and CirTran Against Jimmy Esebag)

91.    Plaintiffs incorporate the allegations set forth above.

92.    PlayBev and Mr. Esebag are parties to the Letter Agreement, which is a valid and binding contract.  A copy of the Letter Agreement is attached as Exhibit 3.

93.    CirTran is an intended beneficiary of the Letter Agreement.

94.    Under the Letter Agreement, Mr. Esebag agreed to explore potential markets for PlayBev's products, to conduct due diligence on behalf of PlayBev, and to identify potential distributors for PlayBev's products in exchange for a set commission.

95.    Likewise, the Letter Agreement acknowledges that Mr. Esebag will be given certain proprietary information regarding Plaintiffs, including pricing, sourcing, and product formulation information, which was to be maintained in the strictest confidence.

96.    PlayBev has fully performed under the Letter Agreement in that it has paid Mr. Esebag commissions as they come due.

97.    Mr. Esebag has breached the Letter Agreement.  Instead of locating potential distributors to assist PlayBev in expanding its distribution network, Mr. Esebag has used Plaintiffs' resources and its confidential information in order to identify potential competitive entities who would attempt to replace PlayBev as the Playboy Energy Drink's exclusive licensee. Mr. Esebag has further used Plaintiffs' confidential information for the benefit of these competitors by assisting the competitors in presenting offers to Playboy on terms that are more

Exhibit A  Page 25

favorable than those offered by Plaintiffs. Mr. Esebag has engaged in these activities for personal financial gain.

98.     Plaintiffs have been damaged by Mr. Esebag's conduct, which interfered with the distribution network and has inhibited PlayBev's ability to meet and cure its monetary obligations under the License Agreement.

99.     Plaintiffs are entitled to damages in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION
**(Aiding and Abetting a Breach of Contract – PlayBev and CirTran Against Playboy)**

100.    Plaintiffs incorporate the allegations set forth above.

101.    PlayBev and Mr. Esebag are parties to the Letter Agreement. CirTran is an intended beneficiary of the Letter Agreement.

102.    Under the Letter Agreement, Mr. Esebag agreed to explore potential markets for PlayBev's products, to conduct due diligence on behalf of PlayBev, and to identify potential distributors for PlayBev's products in exchange for a set commission.

103.    Likewise, the Letter Agreement acknowledges that Mr. Esebag will be given certain proprietary information regarding Plaintiffs, including pricing, sourcing, and product formulation information, which was to be maintained in the strictest confidence.

104.    PlayBev has fully performed under the Letter Agreement in that it has paid Mr. Esebag commissions as they come due.

105.    Mr. Esebag has breached the Letter Agreement. Instead of locating potential distributors to assist Plaintiffs in expanding their distribution network, Mr. Esebag has used Plaintiffs' resources and their confidential information in order to identify potential competitive entities who would attempt to replace PlayBev as the Playboy Energy Drink's exclusive licensee. Mr. Esebag has further used Plaintiffs' confidential information for the benefit of these

competitors by assisting the competitors in presenting offers to Playboy on terms that are more favorable than those offered by Plaintiffs.   Mr. Esebag has engaged in these activities for personal financial gain.

106.   Playboy knew of the Letter Agreement and Mr. Esebag's obligations to PlayBev under the Letter Agreement.   Playboy knew of Mr. Esebag's obligations to PlayBev and encouraged Mr. Esebag to breach those obligations.   Playboy encouraged Mr. Esebag to find competitor entities who could replace PlayBev as the Playboy Energy Drink's exclusive licensee. Playboy assisted Mr. Esebag's negotiations with competitor entities who would attempt to replace PlayBev as the Playboy Energy Drink's exclusive licensees.   Moreover, although Playboy knew that Mr. Esebag was in breach of his agreement with PlayBev, Playboy did not inform Plaintiffs.   To the contrary, Playboy intentionally misled Plaintiffs and hid the fact that Mr. Esebag was in breach of his agreement with PlayBev and that Playboy was aiding that breach.

107.   Plaintiffs have been damaged by Playboy's conduct, which interfered with the distribution network and has inhibited PlayBev's ability to meet and cure its monetary obligations under the License Agreement.

108.   Plaintiffs are entitled to damages in an amount to be proven at trial.

109.   Playboy's conduct was intentional, willful, and malicious, such that Plaintiffs are also entitled to punitive damages in an amount to be proven at trial.

### NINTH CAUSE OF ACTION
**(Tortious Interference with Contract – PlayBev
and CirTran Against Jimmy Esebag and ULG)**

110.   Plaintiffs incorporate the allegations set forth above.

111.   PlayBev has entered into a License Agreement with Playboy in order to obtain the exclusive rights to manufacture, distribute, promote, and sell the Playboy Energy Drink.   The

Exhibit A Page 27

License Agreement is a valid and binding contract.  CirTran is an intended beneficiary of the License Agreement

112.   By contract, Plaintiffs have authorized third-parties to exclusively manufacture, distribute, promote, and/or sell the Playboy Energy Drink.  This network of distributors, sub-licensees, and business parties is a unique and irreplaceable asset on which the survival of Plaintiffs' business depends.

113.   Mr. Esebag and ULG are aware of PlayBev's License Agreement, as well as Plaintiffs' exclusive agreements with others.  ULG and Mr. Esebag have materially benefited from these relationships and have been paid commissions from the revenue generated from these relationships.

114.   Mr. Esebag and ULG have intentionally and tortiously interfered with Plaintiffs' contracts in order to obtain a wrongful financial gain.  Mr. Esebag and ULG's tortious acts include, but are not necessarily limited to:

   a)   Encouraging Playboy to breach its License Agreement with PlayBev by entering into formal negotiations with Redi FZE, a known distributor, in order to replace PlayBev as the licensee for the Playboy Energy Drink;

   b)   Encouraging Redi FZE to breach its Manufacturing and Distribution Agreement by entering into formal negotiations with Playboy to replace PlayBev as the licensee for the Playboy Energy Drink;

   c)   Communicating with distributors and sub-licensees for purposes of obstructing Plaintiffs' efforts to obtain royalties that were needed to satisfy PlayBev's monetary obligations to Playboy under the License Agreement; and

   d)   Misrepresenting to distributors that Mr. Esebag is "in charge of the Playboy Energy Drink License."

115.   Mr. Esebag and ULG have engaged in the foregoing conduct with an improper purpose and for improper means.  Specifically, Mr. Esebag and ULG have engaged in this course

of conduct in order to replace PlayBev as the exclusive licensee of the Playboy Energy Drink with an alternative licensee that will pay higher royalties and commissions.

116.   Mr. Esebag and ULG's conduct have interfered with Plaintiffs' distribution network and inhibited PlayBev's ability to meet and cure its monetary obligations under the License Agreement.

117.   Plaintiffs are entitled to damages for Mr. Esebag and ULG's tortious conduct in an amount to be proven at trial, and which is believed to be in excess of several million dollars.

118.   Mr. Esebag and ULG's conduct was intentional, willful, and malicious, such that PlayBev is also entitled to punitive damages in an amount to be proven at trial.

**TENTH CAUSE OF ACTION**
**(Tortious Interference with Prospective Economic Advantage –**
**PlayBev and CirTran Against Jimmy Esebag, ULG,**
**Ron Coopersmith, RLC Partners, Paul Levin, Redi FZE, and Playboy)**

119.   Plaintiffs incorporate the allegations set forth above.

120.   PlayBev has entered into a License Agreement with Playboy in order to obtain the exclusive rights to manufacture, distribute, promote, and sell the Playboy Energy Drink.  The License Agreement is a valid and binding contract.

121.   CirTran is an intended beneficiary of the License Agreement.  Defendants were aware of CirTran's contract with PlayBev and are further aware of CirTran's efforts to develop, market, and promote the Playboy Energy Drink through CirTran's expansive distribution network.   Defendants have materially benefited from CirTran's efforts and have obtained revenue from CirTran's efforts.

122.   By contract, Plaintiffs have authorized third-parties to exclusively manufacture, distribute, promote, and/or sell the Playboy Energy Drink.  This network of distributors, sub-licensees, and business parties is a unique and irreplaceable asset on which the survival of

Exhibit A Page 29

Plaintiffs' business depends.  Plaintiffs had a reasonable expectancy of benefiting from these contracts and from entering into additional distribution, manufacturing, and sub-license contracts that would have benefited Plaintiffs economically.

123.    Mr. Esebag, ULG, RLC Partners, Ron Coopersmith, Paul Levin, Redi FZE, and Playboy are aware of Plaintiffs' expectancy of earning royalties from their distribution agreements with others and their expectancy of entering additional distribution, manufacturing, and sub-license contracts.

124.    Mr. Esebag, ULG, RLC Partners, Ron Coopersmith, Paul Levin, Redi FZE, and Playboy have intentionally and tortiously interfered with these legitimate business expectancies in order to obtain a wrongful financial gain.  Mr. Esebag, ULG, RLC Partners, Ron Coopersmith, Paul Levin, Redi FZE, and Playboy's tortious acts include, but are not necessarily limited to:

a)    Encouraging and entering into formal negotiations with Redi FZE, a known distributor, in order to replace PlayBev as the licensee for the Playboy Energy Drink;

b)    Encouraging Redi FZE to breach its Manufacturing and Distribution Agreement by entering into formal negotiations with Playboy to replace PlayBev as the licensee for the Playboy Energy Drink;

c)    Communicating with distributors and sub-licensees for purposes of obstructing Plaintiff efforts to obtain royalties that were needed to satisfy PlayBev's monetary obligations to Playboy under the License Agreement; and

d)    Misrepresenting to distributors that Mr. Esebag is "in charge of the Playboy Energy Drink License."

125.    Mr. Esebag, ULG, RLC Partners, Ron Coopersmith, Paul Levin, Redi FZE, and Playboy have engaged in the foregoing conduct with an improper purpose and for improper means.  Specifically, Mr. Esebag, ULG, RLC Partners, Ron Coopersmith, Paul Levin, Redi FZE, and Playboy have engaged in this course of conduct in order to replace PlayBev as the exclusive licensee of the Playboy Energy Drink with an alternative licensee that will pay higher royalties

and commissions. Mr. Esebag, ULG, RLC Partners, Ron Coopersmith, Paul Levin, Redi FZE, and Playboy have engaged in this course of conduct in order to take over the extensive distribution and manufacturing network created by Plaintiffs and thereby misappropriate the current and future economic benefits and expectancies of that distribution and manufacturing network.

126.   Plaintiffs are entitled to damages for Mr. Esebag, ULG, RLC Partners, Ron Coopersmith, Paul Levin, Redi FZE, and Playboy's tortious conduct in an amount to be proven at trial, and which is believed to be in excess of several million dollars.

127.   Mr. Esebag, ULG, RLC Partners, Ron Coopersmith, Paul Levin, Redi FZE, and Playboy's conduct was intentional, willful, and malicious, such that Plaintiffs are also entitled to punitive damages in an amount to be proven at trial.

### ELEVENTH CAUSE OF ACTION
**(Breach of Contract – PlayBev and CirTran Against RLC Partners)**

128.   Plaintiffs incorporate the allegations set forth above.

129.   PlayBev and RLC Partners are parties to a written Broker Agreement dated June 1, 2009 (the "**Broker Agreement**"), which is a valid and binding contract. A copy of the Broker Agreement is attached as Exhibit 4.

130.   CirTran is an intended beneficiary of the Broker Agreement.

131.   Under the Broker Agreement, RLC Partners agreed to use its "best efforts to build, maintain and expand" PlayBev's sales and customers within its designated territory. RLC Partners further agreed to develop strategies to increase the market for PlayBev's products, keep PlayBev informed on the state of competition, and to refrain from divulging any confidential information obtained from PlayBev.

132.    PlayBev has fully performed under the Broker Agreement in that it has paid RLC Partners compensation as outlined in the Broker Agreement.

133.    RLC Partners has breached the Broker Agreement. RLC Partners has not used its best efforts to build, maintain, and expand PlayBev's sales and customers, but instead, has utilized PlayBev's resources and confidential information in order to assist potential competitors in replacing PlayBev as the exclusive licensee for the Playboy Energy Drinks.

134.    Plaintiffs have been damaged by RLC Partners' conduct in an amount to be proven at trial.

## TWELFTH CAUSE OF ACTION
### (Aiding and Abetting a Breach of Contract – PlayBev and CirTran Against Playboy)

135.    Plaintiffs incorporate the allegations set forth above.

136.    PlayBev and RLC Partners are parties to a written Broker Agreement dated June 1, 2009 (the "**Broker Agreement**"), which is a valid and binding contract. CirTran is an intended beneficiary of the Broker Agreement.

137.    Under the Broker Agreement, RLC Partners agreed to use its "best efforts to build, maintain and expand" PlayBev's sales and customers within its designated territory. RLC Partners further agreed to develop strategies to increase the market for PlayBev's products, keep PlayBev informed on the state of competition, and to refrain from divulging any confidential information obtained from PlayBev.

138.    PlayBev has fully performed under the Broker Agreement in that it has paid RLC Partners compensation as outlined in the Broker Agreement.

139.    RLC Partners has breached the Broker Agreement. RLC Partners has not used its best efforts to build, maintain, and expand PlayBev's sales and customers, but instead, has

utilized Plaintiffs' resources and confidential information in order to assist potential competitors in replacing PlayBev as the exclusive licensee for the Playboy Energy Drinks.

140.   Playboy knew of the Broker Agreement and RLC Partners' obligations under the Letter Agreement and encouraged RLC Partners to breach those obligations.   Playboy encouraged RLC Partners to find competitor entities who could replace PlayBev as the Playboy Energy Drink's exclusive licensee.  Playboy assisted RLC Partners' negotiations with competitor entities who would attempt to replay PlayBev as the Playboy Energy Drink's exclusive licensees. Moreover, although Playboy knew that RLC Partners was in breach of its agreement with PlayBev, Playboy did not inform Plaintiffs.  To the contrary, Playboy intentionally mislead Plaintiffs and hid the fact that RLG Partners was in breach of its agreement with PlayBev and that Playboy was aiding that breach.

141.   Plaintiffs have been damaged by Playboy's conduct.

142.   Plaintiffs are entitled to damages in an amount to be proven at trial.

143.   Playboy's conduct was intentional, willful, and malicious, such that Plaintiffs are also entitled to punitive damages in an amount to be proven at trial.

### THIRTEENTH CAUSE OF ACTION
### (Tortious Interference with Contract – PlayBev and
### CirTran Against Coopersmith and RLC Partners)

144.   Plaintiffs incorporate the allegations set forth above.

145.   PlayBev has entered into a License Agreement with Playboy in order to obtain the exclusive rights to manufacture, distribute, promote, and sell the Playboy Energy Drink.  The License Agreement is a valid and binding contract.  CirTran is an intended beneficiary of the License Agreement.

146.   Plaintiffs also contract with various distributors and sub-licensees who manufacture, distribute, promote, and/or sell the Playboy Energy Drink pursuant to written

distribution agreements. Plaintiffs' network of distributors, sub-licensees, and business contacts is a unique and irreplaceable asset on which the survival of Plaintiffs' business depends.

147.   Mr. Coopersmith and his entity, RLC Partners, are aware of PlayBev's License Agreement, as well as PlayBev's agreements with its distributors/sub-licensees. Mr. Coopersmith and RLC Partners have materially benefited from these relationships and have been paid compensation by PlayBev from the revenue generated from these relationships.

148.   Mr. Coopersmith and RLC Partners have interfered with PlayBev's contract with Playboy, as well as Plaintiffs' contracts with its distributors and sub-licensees. Mr. Coopersmith and RLC Partners' tortious acts include, but are not necessarily limited to:

a)   Encouraging Playboy to breach its License Agreement with PlayBev by entering into formal negotiations with Redi FZE, a known distributor, in order to replace PlayBev as the licensee for the Playboy Energy Drink;

b)   Encouraging Redi FZE to breach its Manufacturing and Distribution Agreement by entering into formal negotiations with Playboy to replace PlayBev as the licensee for the Playboy Energy Drink;

c)   Communicating with distributors and sub-licensees for purposes of obstructing Plaintiffs' efforts to obtain royalties that were needed to satisfy PlayBev's monetary obligations to Playboy under the License Agreement; and

d)   Misusing Plaintiffs' confidential information for purposes of encouraging Playboy, Redi FZE and others to breach their contracts with Plaintiffs.

149.   Mr. Coopersmith and RLC Partners have engaged in the foregoing conduct with an improper purpose, for improper means and for financial gain. Specifically, Mr. Coopersmith and RLC Partners have engaged in this course of conduct in order to replace PlayBev as the exclusive licensee of the Playboy Energy Drink with an alternative licensee that will pay higher royalties and commissions.

150.    Mr. Coopersmith and RLC Partners' conduct has interfered with Plaintiffs' distribution network and inhibited PlayBev's ability to meet and cure its monetary obligations under the License Agreement.

151.    Plaintiffs are entitled to damages for Mr. Coopersmith and RLC Partners' tortious conduct in an amount to be proven at trial, and which is believed to be in excess of several million dollars.

152.    Mr. Coopersmith and RLC Partners' conduct was intentional, willful, and malicious, such that Plaintiffs are also entitled to punitive damages in an amount to be proven at trial.

## FOURTEENTH CAUSE OF ACTION
### (Tortious Interference with Contract – PlayBev and CirTran Against Redi FZE)

153.    Plaintiffs incorporate the allegations set forth above.

154.    PlayBev has entered into a License Agreement with Playboy in order to obtain the exclusive rights to manufacture, distribute, promote, and sell the Playboy Energy Drink.  The License Agreement is a valid and binding contract.  CirTran is an intended beneficiary of the License Agreement.

155.    Redi FZE is aware of PlayBev's License Agreement with Playboy.  Redi FZE has materially benefited from the License Agreement in that it has manufactured, distributed, promoted, and/or sold the Playboy Energy Drink in certain territories as an authorized sub-licensee and generated revenue from those activities.

156.    Redi FZE has interfered with PlayBev's contract with Playboy by encouraging Playboy to breach its License Agreement with PlayBev and to enter into a new, replacement license with Redi FZE.

31

Exhibit A Page 35

157.    Redi FZE has engaged in the foregoing conduct with an improper purpose, for improper means and for financial gain.  Specifically, Redi FZE has engaged in this course of conduct so that it can replace PlayBev as the exclusive licensee of the Playboy Energy Drink in violation of a contractual non-circumvention provision.

158.    Plaintiffs are entitled to damages for Redi FZE's tortious conduct in an amount to be proven at trial, and which is believed to be in excess of several million dollars.

159.    Redi FZE's conduct was intentional, willful, and malicious, such that Plaintiffs are also entitled to punitive damages in an amount to be proven at trial.

### FIFTEENTH CAUSE OF ACTION
**(Aiding and Abetting Breach of Contracts – CirTran and PlayBev Against
Jimmy Esebag, ULG, Ron Coopersmith, RLC Partners, Paul Levin, and Playboy)**

160.    Plaintiffs incorporate the allegations set forth above.

161.    CirTran has distribution agreements with entities throughout the world pursuant to which these entities are given the right to distribute the Playboy Energy Drink (the "Distribution Agreements").  PlayBev is an intended beneficiary of the Distribution Agreements.

162.    CirTran has fully performed under the Distribution Agreements, including the Manufacturing and Distribution Agreement.

163.    Playboy, Esebag, ULG, Coopersmith, RLC Partners, and Levin knew of the Distribution Agreements and have and encouraged CirTran's distributors to breach those obligations.

164.    By way of example, Defendants have facilitated Redi FZE's breach the Manufacturing and Distribution Agreement and violation of its contractual non-circumvention agreement with CirTran.  Defendants have also encouraged Redi FZE to enter into formal negotiations with Playboy to replace PlayBev as the licensee for the Playboy Energy Drink.

165.    Specifically, Playboy, Esebag, ULG, Coopersmith, RLC Partners, and Levin all knew and understood that Redi FZE was still under contract at the time their negotiations were occurring and knew that Redi FZE's distribution contract contained non-circumvention provisions.  Moreover, Playboy, Esebag, ULG, Coopersmith, RLC Partners, and Levin knew that it was actionable for Redi FZE and Playboy to enter into negotiations while PlayBev's License Agreement remained in effect.  Upon information and belief, Redi FZE's counsel had advised that the parties' negotiations were tortious, and conveyed this opinion in communications with Playboy representative Judy Kawal.

166.    Nevertheless, Esebag, ULG, Coopersmith, RLC Partners, Levin and Playboy actively promoted the negotiations between Redi FZE and Playboy.  They facilitated and arranged for Playboy and Redi FZE to meet and commence negotiations, and anticipated that Redi FZE would take over the expansive distribution network that had been constructed by PlayBev and CirTran from scratch, and in fact, encouraged Redi FZE to do so.

167.    Defendants have engaged in similar misconduct with respect to CirTran's other distributors, and have encouraged other distributors to withhold payment from CirTran.  As a result of the Defendants' conduct, other distributors have also breached their Distribution Agreements by failing to make payments owing to CirTran.

168.    Plaintiffs have been damaged by Esebag, ULG, Coopersmith, RLC Partners, Levin and Playboy's conduct, which caused CirTran's distributors to withhold payments owed to CirTran.

169.    Defendants' interference with Plaintiffs' distribution contracts also interrupted PlayBev's revenue stream and further inhibited PlayBev's ability to meet and cure its monetary obligations under the License Agreement.

Exhibit A Page 37

170.    Plaintiffs are entitled to damages in an amount to be proven at trial.

## SIXTEENTH CAUSE OF ACTION
### (Tortious Interference with Contract – PlayBev v. Paul Levin)

171.    PlayBev incorporates the allegations set forth above.

172.    PlayBev has entered into a License Agreement with Playboy in order to obtain the exclusive rights to manufacture, distribute, promote, and sell the Playboy Energy Drink.  The License Agreement is a valid and binding contract.

173.    Paul Levin is aware of PlayBev's License Agreement with Playboy. Mr. Levin has materially benefited from the License Agreement in that his entity, Redi FZE, has manufactured, distributed, promoted, and/or sold the Playboy Energy Drink in certain territories as an authorized sub-licensee and generated revenue from those activities.

174.    Mr. Levin has interfered with PlayBev's contract with Playboy by encouraging Playboy to breach its License Agreement with PlayBev and to enter into a new, replacement license with Redi FZE.

175.    Mr. Levin has engaged in the foregoing conduct with an improper purpose, for improper means and for financial gain.  Specifically, Mr. Levin has engaged in this course of conduct so that Redi FZE can replace PlayBev as the exclusive licensee of the Playboy Energy Drink in violation of a contractual non-circumvention provision.

176.    PlayBev is entitled to damages for Mr. Levin's tortious conduct in an amount to be proven at trial, and which is believed to be in excess of several million dollars.

177.    Mr. Levin's conduct was intentional, willful, and malicious, such that PlayBev is also entitled to punitive damages in an amount to be proven at trial.

Exhibit A Page 38

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request relief as follows:

A.     On its First Cause of Action, for an award of damages against Playboy in an amount to be proven at trial.

B.     On its Second Cause of Action, for an award of damages against Playboy in an amount to be proven at trial.

C.     On its Third Cause of Action, for an award of general damages and punitive damages against Playboy in an amount to be proven at trial.

D.     On its Fourth Cause of Action, for an award of general damages and punitive against Playboy, Jimmy Esebag, ULG, Ron Coopersmith, Paul Levin, RLC Partners, and Redi FZE, each to be held jointly and severally liable, in an amount to be proven at trial.

E.     On its Fifth Cause of Action, for an award of damages against Playboy in an amount to be proven at trial.

F.     On its Sixth Cause of Action, for a preliminary injunction and permanent injunction enjoining Playboy, and all persons or entities acting on its behalf, from terminating PlayBev's License Agreement.

G.     On its Seventh Cause of Action, for an award of damages against Jimmy Esebag in an amount to be proven at trial.

H.     On its Eighth Cause of Action, for an award of general damages and punitive damages against Playboy in an amount to be proven at trial.

I.     On its Ninth Cause of Action, for an award of general and punitive damages against Jimmy Esebag and ULG, each to be held jointly and severally liable, in an amount to be proven at trial.

Exhibit A  Page 39

J.      On its Tenth Cause of Action, for an award of general damages and punitive against Playboy, Jimmy Esebag, ULG, Ron Coopersmith, Paul Levin, RLC Partners, and Redi FZE, each to be held jointly and severally liable, in an amount to be proven at trial..

K.      On its Eleventh Cause of Action, for an award of damages against RLC Partners in an amount to be proven at trial.

L.      On its Twelfth Cause of Action, for an award of general and punitive damages against Playboy in an amount to be proven at trial.

M.      On its Thirteenth Cause of Action, for an award of general and punitive damages against Ron Coopersmith and RLC Partners, each to be held jointly and severally liable, in an amount to be proven at trial.

N.      On its Fourteenth Cause of Action, for an award of general and punitive damages against Redi FZE in an amount to be proven at trial.

O.      On its Fifteenth Cause of Action, for an award of general and punitive damages against Jimmy Esebag, ULG, Ron Coopersmith, RLC Partners, Paul Levin, and Playboy, each to be held jointly and severally liable, in an amount to be proven at trial.

P.      On its Sixteenth Cause of Action, for an award of general and punitive damages against Paul Levin in an amount to be proven at trial.

Q.      For all other relief necessary to carry out the Court's declaratory judgments;

R.      For attorneys' fees and costs as provided for by contract, statute, or other applicable law.

S.      For such other and further relief as the Court deems just and appropriate in the circumstances.

Exhibit A Page 40

## JURY DEMAND

Plaintiffs demand a jury on all issues triable as a matter of right.

Dated:  November 6, 2012                    Respectfully submitted,

                                            PLAY BEVERAGES LLC and
                                            CIRTRAN BEVERAGE CORP.

                            By:    _____
                                            One of Their Attorneys

Michael P. Conway
Patrick J. Castle
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL  60606
(312) 704-7700
No. 17044

Of Counsel (*Pro Hac Vice to be filed*):
Bryon J. Benevento
Kimberly Neville
Chris J. Martinez
DORSEY & WHITNEY LLP
Kearns Building
136 South Main Street
Suite 1000
Salt Lake City, UT 84101-1685
(801) 933-7360

Exhibit A Page 41

# EXHIBIT 1



## INDEX TO PLAY BEVERAGES, LLC
## PRODUCT LICENSE AGREEMENT

THE SCHEDULE

<u>PARAGRAPH</u>                                                                                  <u>PAGE NO.</u>

1.    GRANT OF LICENSE
      a.    Grant                                                                               6 - 9
      b.    Term                                                                               9 - 10
      c.    License Year and License Quarter                                                    10
      d.    Territory                                                                           10
      e.    Minimum Net Sales                                                                 10 - 11

2.    COVENANTS OF LICENSEE
      a.    Use                                                                              11 - 12
      b.    Best Efforts
            (l)    Maintaining Goodwill                                                         12
            (ii)   Distribution Channels                                                        12
      c.    Royalties
            (i)    Guaranteed Royalties                                                      12 - 13
            (ii)   Earned Royalties                                                             13
            (iii)  Interest                                                                     13
            (Iv)   Letter of Credit                                                             13
      d.    Statements and Payments                                                          13 - 14
      e.    Records and Audit                                                                14 - 15
      f.    Expenses of Conducting Examinations                                                 15
      g.    Product Quality                                                                     15
      h.    Approval of Products and the Materials                                           15 - 17
      i.    Title and Protection and Preservation
            of the Playboy Properties                                                        17 - 18
      j.    Right to Subcontract, Licensee Financial Statements
            and Lists of Sources and Accounts                                                18 - 19
      k.    Inventory                                                                           19
      l.    Playboy Properties and Non-Competitive Brands                                    19 - 20
      m.    Indemnification and Product
            Liability Insurance                                                              20 - 21
      n.    Advertising Expenditures, Advertising Plans and Public Relations                 21 - 22

3.    ADDITIONAL COVENANTS OF THE PARTIES
      a.    Reservation of Rights                                                               22
      b.    Certain Sales                                                                       22

4.    TITLE AND PROTECTION
      a.    Indemnification by Licensor                                                      22 - 23
      b.    Enforcement                                                                         23

5.    RELATIONSHIP BETWEEN THE PARTIES
      a.    No Joint Venture                                                                    23
      b.    Assignment                                                                       23 - 24

Exhibit A Page 43

Case 2:12-26046 DJC 29-2 Document 07/21/11 Filed 12/27/12 Page 41 of 50 Desc Main

Case 11-26046    Doc 16-1    Filed 06/27/11    Entered 06/27/11 17:30:57    Desc Exhibit
A    Part 2    Page 4 of 28
Exhibit 1    pt. 1    Page 3 of 27

INDEX TO PLAY BEVERAGES, LLC
PRODUCT LICENSE AGREEMENT

(Continued)

| | | |
|---|---|---:|
| 6. | SUBLICENSING | 24 |
| 7. | DEFAULTS AND RIGHTS OF TERMINATION | |
| | a.    Defaults and Right to Cure | 24 |
| | b.    Bankruptcy or Assignment for | |
| |     Creditors, Business Discontinuance | 24 - 25 |
| | c.    Loss of Trademark Rights | 25 |
| | d.    Qualified Auditor's Report | 25 |
| | e.    Cross-Default | 25 |
| 8. | EXPIRATION OR TERMINATION | |
| | a.    Effect of Expiration or Termination | 25 |
| | b.    Reserved Rights | 25 |
| | c.    Continued Sales After Expiration | |
| |     or Termination | 25 - 26 |
| | d.    Inventory After Expiration or Termination | 26 |
| | e.    Equitable Relief and Legal Fees | 26 - 27 |
| | f.    Termination Fee | 27 |
| 9. | NOTICES | |
| | a.    Effectiveness | 27 |
| | b.    Address Change | 28 |
| 10. | CONFIDENTIAL INFORMATION | 28 |
| 11. | SEVERABILITY | 28 |
| 12. | CONSENTS AND APPROVALS | 28 |
| 13. | APPLICABLE LAW | 28 |
| 14. | NO BROKER | 29 |
| 15. | CONSTRUCTION | 29 |
| 16. | SURVIVABILITY | 29 |
| 17. | RIGHTS CUMULATIVE | 29 |
| 18. | ENTIRE AGREEMENT | 29 |

Exhibit A  Page 44

Case 2:12-cv-14590-DSJ-E2  Document 07/01/11  Filed 10/27/12  Page 42 of 50  Page ID #:301
Case 11-26046  Doc 29-2  Filed 07/01/11  Entered 10/27/12  Page 42 of 50  Page ID #:301
A  Part 2  Page 5 of 28
Case 11-26046  Doc 16-1  Filed 06/27/11  Entered 06/27/11 17:30:57  Desc Exhibit
Exhibit 1  pt. 1  Page 4 of 27

THE SCHEDULE referred to in the Agreement made as of November 1, 2006.

S.1.    LICENSOR:    PLAYBOY ENTERPRISES INTERNATIONAL, INC.
680 North Lake Shore Drive
Chicago, IL 60611

S.2.    LICENSEE:    PLAY BEVERAGES, LLC
c/o Goldring, Hertz and Lichtenstein
450 Roxbury, 8th Floor
Beverly Hills, CA 90210
Contact:    Mr. Ken Hertz
Telephone:    310 248 3107
Email:    ken@ghlh.com

S.3.    THE TRADEMARKS:

PLAYBOY and RABBIT HEAD DESIGN (as depicted in Exhibit A attached hereto and made a part hereof).

THE IMAGES:

Certain images from Licensor's art and photo archives, which are approved in advance in writing by Licensor on a case-by-case basis. Although Licensee may submit to Licensor its request to use certain images, the specific images to be added to the Agreement will be granted in Licensor's sole discretion, based on appropriateness for the Products, Licensor's current strategic or business plan and availability of rights.

S.4.    THE TYPE OF LICENSE:

Exclusive, except as set forth in Paragraph S.5. below and Paragraph 1.a.(iii) of the Agreement.

S.5.    THE USE OF THE PLAYBOY PROPERTIES:

Design, manufacture, advertise, promote, sell and distribute the Products (either directly itself or through distributors) to or through: (i) Playboy-branded retail stores, which rights shall be non-exclusive and subject to the provisions of Paragraph 1.a.(iii)(c) and Paragraph 1.a.(iv) of the Agreement, mass retail stores, supermarkets, convenient stores, wholesale retail outlets such as Costco, discount beverage outlets and specialty stores (i.e. physical stores) located in the Territory (which may or may not have their own "E-Commerce Web Site" (as such term is defined in Paragraph 1.a.(iii) of the Agreement)); (ii) non-Playboy branded catalogs; (iii) "E-tailers" (as such term is hereinafter defined) which will promote the availability of the Products via such E-tailers' E-commerce Web Sites and which will fulfill orders for the Products placed through such E-commerce Web Sites to, and only to, those addresses located in the Territory; and (iv) an E-commerce Web Site owned or controlled by either Licensee or any such distributor which will promote the availability of the Products via such E-commerce Web Site and which will fulfill orders for the Products placed through such E-commerce Web Site to, and only to, those addresses located in the Territory. "E-tailers" shall mean any entity engaged in the promotion and sale of the Products whose primary means of promotion, sale or distribution of the Products is via an E-commerce Web Site. All rights granted under the License shall be subject to the terms and conditions of the E-commerce Guidelines attached hereto as Exhibit B and made a part hereof. In the event Licensee, or any affiliated or third-party distributor of Licensee's, fails to adhere to the terms and

Exhibit A Page 45

Case 2:12-cv-01590-DJC-2 Document 97-21-11 Filed 12/12/21 Page 43 of 50 Page ID #:302
Case 11-26046 Doc 29-2 Document 07/21/11 Entered 12/12/21 Page 43 of 50 Page ID #:302
A    Part 2    Page 6 of 28
Case 11-26046    Doc 16-1    Filed 06/27/11    Entered 06/27/11 17:30:57    Desc Exhibit
Exhibit 1    pt. 1    Page 5 of 27

conditions of the E-commerce Guidelines, Licensor may deem such failure to be an incurable default under the terms and conditions of the Agreement. Licensee may not sell and distribute the Products to or through duty-free outlets as duty-free avenues of distribution are not included in the definition of such physical stores.

S.6.    **THE PRODUCTS:**

Non-alcoholic energy drinks and water. Additional products may be added as Products under this Paragraph S.6. only upon Licensor's prior written approval and subject to the provisions of an amendment to this Agreement signed by both Licensee and Licensor.

S.7.    **THE TERRITORY:**

Australia, Benelux, Brazil, Canada, Chile, China, Denmark, France, Germany, Greece, Hong Kong, Ireland, Israel, Italy, Japan, Korea, Lebanon, Mexico, New Zealand, Norway, Peru, Philippines, Portugal, Russia, South Africa, Spain, Sweden, Switzerland, Taiwan, Thailand, United Arab Emirates, United Kingdom and the United States and the United States' territories and possessions; provided, however, that only Products bearing the RABBIT HEAD DESIGN Trademark may be advertised, promoted, sold and/or distributed in Chile and Japan.

S.8.    **THE COMMENCEMENT DATE:**

November 1, 2006

S.9.    **THE EXPIRATION DATE:**

March 31, 2012; subject to the Renewal Term in Paragraph 1.b.(ii) and the termination provisions set forth in the Agreement.

S.10.    **THE MINIMUM NET SALES:**

| License Year | Amount |
|---|---|
| LY 1 (11/01/06 – 03/31/08) | U.S.$10,000,000 |
| LY 2 (04/01/08 – 03/31/09) | U.S.$10,000,000 |
| LY 3 (04/01/09 – 03/31/10) | U.S.$10,000,000 |
| LY 4 (04/01/10 – 03/31/11) | U.S.$10,000,000 |
| LY 5 (04/01/11 – 03/31/12) | U.S.$10,000,000 |

S.11.    **GUARANTEED ROYALTIES:**

| License Year | Amount |
|---|---|
| LY 1 (11/01/06 – 03/31/08) | U.S.$1,000,000 |
| LY 2 (04/01/08 – 03/31/09) | U.S.$1,000,000 |
| LY 3 (04/01/09 – 03/31/10) | U.S.$1,000,000 |
| LY 4 (04/01/10 – 03/31/11) | U.S.$1,000,000 |
| LY 5 (04/01/11 – 03/31/12) | U.S.$1,000,000 |

Exhibit A Page 46

S.12.   **EARNED ROYALTIES:**

Ten percent (10%) of "Net Sales" (as defined in Paragraph 2.d.(ii) and subject to the provisions of Paragraph 3.b.(ii)) of the Products. In the event Licensee marks down its standard invoice price for any Product in excess of thirty percent (30%), Earned Royalties on such sales will be computed as if such invoice price was marked down not more than thirty percent (30%).

S.13.   **THE ADDRESS WHERE BOOKS KEPT:** See Paragraph S.2. above.

S.14.   **EUROPEAN UNION:**

a.   Within member states of the European Community (the "EU"), rights or obligations created or imposed by the License and this Agreement may not be exercised or enforced in a manner contrary to EU Law.

b.   Licensee may not solicit orders from outside the Territory nor engage in any commercial or promotional activities with respect to the Products outside the Territory, the right of any purchaser of the Products within the Territory to export the Product purchased to other member states of the EU staying unaffected.

c.   Limitation of the exercise of rights or the enforcement of obligations due to EU Law or the provisions of the foregoing subparagraphs shall not affect the validity or enforceability of any other rights and obligations under this Agreement.


PLAY BEVERAGES, LLC                          PLAYBOY ENTERPRISES
(LICENSEE)                                   INTERNATIONAL, INC.
                                             (LICENSOR)

By: _____                 By: _____
      DBD MEMBRAIN, LLC

Title: AUTHORIZED SIGNER                     Title: President, Global Licensing & Exec. VP

Date: NOVEMBER 30, 2006                      Date: 12/13/06

## LICENSE AGREEMENT

This Agreement is made as of November 1, 2006, by and between the corporation described in Paragraph S.1. of the Schedule attached hereto and made a part hereof (hereinafter referred to as "Licensor") and the corporation described in Paragraph S.2. of the Schedule (hereinafter referred to as "Licensee").

### RECITALS

WHEREAS, Licensor has certain rights in and to the trademark PLAYBOY and other trademarks identified in Paragraph S.3. of the Schedule and as depicted in Exhibit A (hereinafter collectively referred to as the "Trademarks") and to certain images from Licensor's photo or art archives (the "Images"). The Trademarks and Images may sometimes be collectively referred to as the "Playboy Properties;"

WHEREAS, Licensee recognizes that the Playboy Properties have been widely used in, on, for or in connection with:

      a.    an internationally distributed magazine (<u>PLAYBOY</u>) and related publications and printed materials published by Licensor or its subsidiaries, affiliates or licensees;

      b.    advertising, promotion, publicity, broadcasting, telecasting and related uses in diverse businesses by Licensor or its subsidiaries or affiliates; and

      c.    the manufacture, advertising, promotion, sale and distribution worldwide of a broad range of consumer products, including, but not limited to, jewelry, clothing, footwear, leather goods, audio and visual recordings, and personal health and home articles and accessories;

WHEREAS, the parties hereto desire that Licensor grant to Licensee a license to use the Playboy Properties in the design, manufacture, advertising, promotion, sale and distribution of the "Products" (as defined in Paragraph 1.a.(i) hereof);

NOW, THEREFORE, in consideration of the mutual promises herein contained, it is mutually agreed as follows:

1.     <u>GRANT OF LICENSE</u>.

      a.    <u>Grant</u>:

          (i)    Upon and subject to the terms and conditions hereinafter set forth, Licensor hereby grants to Licensee, and Licensee hereby accepts, the right, license and privilege specified in Paragraph S.4. of the Schedule to use the Playboy Properties in connection with, and only with, the use specified in Paragraph S.5. of the Schedule on and in connection with specifically designated and approved articles of merchandise specified in Paragraph S.6. of the Schedule (hereinafter collectively referred to as the "Products") in the territory specified in Paragraph S.7. of the Schedule (hereinafter referred to as the "Territory"). Such right, license and privilege is hereinafter referred to as the "License." It is understood and agreed that while the manufacture of the Products may take place outside the Territory, none of the Products may be advertised, promoted, sold or distributed outside the Territory by Licensee except as set forth in Paragraph S.14. of the Schedule attached hereto.

          (ii)    Nothing contained in this Agreement shall prevent Licensor (on behalf of itself and its subsidiaries and affiliated companies) from doing any or all of the following: (a) using or granting one or more others the right or license to use the Playboy Properties on or in connection with the Products in any area of the world other than the Territory or in the Territory through duty free outlets or on or in connection with any services or goods

Case 2:12-cv-01659-JCJ-E2 Document 7/01/11 Filed 12/27/12 Page 46 of 50 Page ID #:305
Case 11-26046 Doc 29-2 A Part 2 Page 9 of 28
Case 11-26046 Doc 16-1 Filed 06/27/11 Entered 06/27/11 17:30:57 Desc Exhibit
Exhibit 1 pt. 1 Page 8 of 27

other than the Products in any or all area(s) of the world including the Territory; and/or (b) manufacturing or having manufactured in the Territory the Products for sale outside the Territory.

(iii)     Anything in this Agreement to the contrary notwithstanding, Licensor (on behalf of itself and its subsidiary and affiliated companies) reserves: (a) the right to produce or have produced the Products to be used in the Territory specifically for promotional and advertising purposes and not for sale; (b) the right to produce or have produced any or all of the Products for the advertisement, promotion, sale and distribution, in the Territory, through direct marketing channels or sales (including, but not limited to, direct mail, catalog houses, home shopping programs, infomercials and the like), premium sales, incentive sales, home party plans or through any other means now known or hereafter available; (c) the right to produce or have produced by any third party the Products or similar products to be advertised, sold and distributed through a Playboy-branded retail store located in the Territory; or (d) the right to produce or have produced any or all of the Products for the advertisement, promotion, sale and distribution in the Territory of any or all of the Products in the Territory, via any E-commerce Web Site or via "Mobile Commerce," which shall mean transactions conducted by Licensee on one or more mobile telecommunications networks exclusively within the Territory and exclusively via the language of each country of the Territory in "Mobile Device" presentations associated with the Playboy Properties. "Mobile Device" means a mobile, wireless device existing as of the Commencement Date or developed thereafter that (i) is intended to be mobile and not commonly used at a fixed location; and (ii) is capable of receiving voice, data, and/or video communications. The definition of "Mobile Device" includes, without limitation, personal digital assistants (PDAs), pagers, mobile phones and other devices receiving communications via wireless fidelity (wi-fi) network and, for the avoidance of doubt, excludes all non-mobile television devices or other devices that function as a receiver or set-top box for a television-type broadcast or other signal, fixed display device or fixed monitor. "E-Commerce Web Site" shall mean promoting, offering, providing or selling the Products using or via communications involving the TCP/IP Protocol or any TCP/IP Successors. "TCP/IP Protocol" (which stands for Transmission Control Protocol/Internet Protocol) shall mean the two-layered program that is the basic communication language or protocol of publicly accessible computer networks such as the Internet and private computer networks such as intranets and extranets. "TCP/IP Successors" shall mean programs, languages, protocols or other technical means that are being developed or that have yet to be developed which are intended to supplement, supersede or replace TCP/IP or its use for communications on computer networks. Any Products advertised, promoted, sold or distributed by Licensor or its subsidiary or affiliated companies for the purposes set forth in subparagraphs (b), (c) and (d) above shall be obtained only from Licensee at the lowest prices offered to other purchasers of the Products ordering similar quantities; provided, however, that in the event Licensee cannot fulfill Licensor's orders (or the orders of Licensor's subsidiary or affiliated companies) for the Products at such low prices or in the quantities or within the time frames needed, Licensor (or its subsidiary or affiliated companies) may seek fulfillment of the relevant orders through one or more third parties without liability or obligation to Licensee.

(iv)     Licensee acknowledges that there are a number of authorized Playboy-branded stores in various countries around the world. In the event the licensees for any such Playboy-branded stores wish to purchase any of the Products from Licensee or its distributors for sale through the Playboy-branded stores, Licensee may fulfill such orders subject to the provisions of this Paragraph 1.a.(iv). While fulfillment of such orders may consist of Licensee or its distributors shipping the Products outside of the Territory, such shipments of the Products to such authorized Playboy-branded stores outside of the Territory will not be a violation of the Territory restrictions set forth in this Agreement; provided, however, that (a) Licensee may not solicit such orders outside of the Territory; (b) Licensee must report such sales separately on the "Statements;" (c) Licensee will include such sales in the calculation of "Net Sales" for the purpose of computing

Exhibit A Page 49

"Minimum Net Sales" and "Earned Royalties;" and (d) Licensee must notify Licensor in advance in writing of any such order and must obtain Licensor's prior written approval to fulfill such orders. Further, in the event Playboy has opened or opens, itself or through a third party, a Playboy-branded store in the Territory, the licensee for such Playboy-branded store in the Territory may source the Products or similar products through any third party anywhere in the world and sell such Products or similar products through such Playboy-branded store in the Territory and such sourcing and selling will not be a violation of the License.

(v)    Anything in this Agreement to the contrary notwithstanding, Licensee shall have no right through the License to open or operate a free-standing retail store using the Playboy Properties or any of Licensor's other intellectual property on or in connection with such store or the signage for such store.

(vi)    Anything in this Agreement to the contrary notwithstanding, Licensee will, not later than September 30, 2007, secure a creditworthy, financially sound guarantor that will guarantee the performance of Licensee's duties and obligations, including, but not limited to, Licensee's financial obligations, under this Agreement; provided, however, that (a) such guarantor will be subject to Licensor's prior reasonable approval not to be unreasonably withheld; and (b) such guarantor will properly execute and send to Licensor, within not more than ten (10) days of Licensor's approval of such guarantor, an undertaking in the form and content as that attached hereto as Exhibit C and made a part hereof. In order for Licensor to determine whether or not such guarantor is acceptable, Licensee will provide Licensor with:

(a)    the proposed guarantor's audited financial statements for the two (2) most recently completed fiscal years;

(b)    the proposed guarantor's interim financial statements for the current fiscal year;

(c)    if the guarantor is a private company, information about the principals as directed by Licensor; and

(d)    such other information as Licensor may reasonably request.

Notwithstanding the foregoing, Licensee's proposed guarantor shall be conclusively deemed creditworthy and financially sound, provided that such proposed guarantor (i) has a median credit score of 70 or higher, as reported by Dun & Bradstreet, Experian Business, Equifax Business and Business Credit USA, as of September 30, 2007, in the event that such guarantor is a business, or a medial credit score of 720 or higher, as reported by Experian, Equifax and TransUnion, in the event that such guarantor is an individual; and (ii) has had a net worth (pursuant to the audited financial statements provided to Licensor, prepared in accordance with Generally Accepted Accounting Principles) of at least Five Million Dollars (U.S.$5,000,000) during each of the previous two (2) financial reporting years. Anything in this Agreement to the contrary notwithstanding, while the proposed guarantor may be conclusively deemed creditworthy and financially sound, such proposed guarantor will be subject to Licensor's security due diligence and will not be approved unless and until such proposed guarantor clears such security-related due diligence in Licensor's reasonable opinion.

In the event that Licensee fails to provide such information or to obtain a guarantor that is approved by Licensor as set forth above, then Licensor will have the right to terminate the Agreement upon written notice; provided, however, that (i) such termination may not be effective any earlier than March 31, 2008; and (ii) Licensee will remit to Licensor, within not more than ten (10) days of the date of Licensor's notice of termination, a termination fee in the amount of U.S.$250,000, which will be over and above any other amount that may be due and payable to Licensor under the Agreement. For purposes of

clarification, Licensor's right to terminate the Agreement as set forth above in this Paragraph 1.a.(vi) will not be deemed to take away any of Licensor's other rights under the Agreement, including, but not limited to, Licensor's right to terminate the Agreement due to another default by Licensee pursuant in accordance with the provisions of this Agreement.

b.    Term:

(i)    The term of the License and this Agreement (hereinafter referred to as the "Term") shall commence on the date specified in Paragraph S.8. of the Schedule (hereinafter referred to as the "Commencement Date") and shall expire at midnight, Chicago time, on the date specified in Paragraph S.9. of the Schedule (hereinafter referred to as the "Expiration Date"), unless sooner terminated by operation of law or as provided in this Agreement.

(ii)    On the conditions that:  (a) Licensee shall be in full compliance with all of the terms and conditions of this Agreement, including the timely payment of all amounts required under this Agreement; (b) the Minimum Net Sales have been met or exceeded for each License Year of this Agreement; (c) Licensor has provided, not later than February 1, 2012, its written approval for the Agreement to renew as set forth in this Paragraph 1.b.(ii), then this Agreement will renew for five (5) additional License Years commencing on April 1, 2012 and ending at midnight, Chicago time, on March 31, 2017 on the same terms and conditions of this Agreement except that (y) the Minimum Net Sales for each License Year of the "Renewal Term" will be U.S.$20,000,000; and (z) the Guaranteed Royalties for each License Year of the "Renewal Term" will be U.S.$2,000,000. Anything in this Agreement to the contrary notwithstanding, in the event that Licensee becomes non-compliant with the terms and conditions of this Agreement after its receipt of Licensor's notice approving the renewal of this Agreement as set forth in this Paragraph 1.a.(ii), or in the event that Licensor does not provide its written approval as set forth above, then this Agreement will not be renewed as set forth in this Paragraph 1.a.(ii) and Licensor shall be free to pursue such licensing opportunities without obligation or liability to Licensee. For ease of reference, such five-year renewal term will be referred to herein as the "Renewal Term" but all the terms and conditions applicable to "Term" shall be deemed applicable to the Renewal Term except to the extent that the terms and conditions of the Renewal Term shall differ from the terms and conditions of this Agreement, in which case the terms and conditions of the renewal of this Agreement shall control as to the Renewal Term.

(iii)    On the conditions that:  (a) Licensee shall be in full compliance with all of the terms and conditions of this Agreement, including the timely payment of all amounts required under this Agreement; (b) the Minimum Net Sales have been met or exceeded for each License Year of this Agreement; (c) Licensor has provided, not later than February 1, 2017, its written approval for the Agreement to renew as set forth in this Paragraph 1.b.(ii), then this Agreement will renew for five (5) additional License Years commencing on April 1, 2017 and ending at midnight, Chicago time, on March 31, 2022 on the same terms and conditions of this Agreement except that (x) there will be no conditional automatic renewal following March 31, 2022; (y) the Minimum Net Sales for each License Year of the "Second Renewal Term" will be the greater of U.S.$40,000,000 or the amount of the Net Sales actually achieved in License Year 10; and (z) the Guaranteed Royalties for each License Year of the "Second Renewal Term" will be the greater of U.S.$4,000,000 or the amount of the Guaranteed Royalty plus the amount of the Earned Royalty due and payable in License Year 10. Anything in this Agreement to the contrary notwithstanding, in the event that Licensee becomes non-compliant with the terms and conditions of this Agreement after its receipt of Licensor's notice approving the renewal of this Agreement as set forth in this Paragraph 1.a.(iii), or in the event that Licensor does not provide its written approval as set forth above, then this Agreement will not be renewed as set forth in this Paragraph 1.a.(iii) and Licensor shall be free to pursue such licensing opportunities without obligation or liability to Licensee. For ease of

Exhibit A Page 51

reference, such five-year renewal term will be referred to herein as the "Second Renewal Term" but all the terms and conditions applicable to "Term" shall be deemed applicable to the Second Renewal Term except to the extent that the terms and conditions of the Second Renewal Term shall differ from the terms and conditions of this Agreement, in which case the terms and conditions of the renewal of this Agreement shall control as to the Second Renewal Term.

    c.    <u>License Year and License Quarter</u>:

        (i)    For all purposes under this Agreement, a "License Year" shall be each twelve (12) consecutive calendar month period commencing on each April 1st of the Term and ending at midnight, Chicago time, on each following March 31st of the Term, except that the first License Year will be the seventeen (17) consecutive calendar months commencing on the Commencement Date and ending at midnight, Chicago time, on March 31, 2008. If the expiration or termination of the License and this Agreement is effective other than at the end of any such seventeen (17) or twelve (12) month period, then the final period of less than seventeen (17) or twelve (12) months ending on the effective date of such expiration or termination shall be deemed to be a License Year.

        (ii)    For all purposes under this Agreement, a "License Quarter" shall be the first five (5) consecutive calendar months of the first License Year and each succeeding three (3) month period of the first License Year and each License Year thereafter, and if the expiration or termination of the License and this Agreement is effective other than at the end of a License Year, then the final period of less than five (5) or three (3) months ending on the effective date of such expiration or termination shall be deemed to be a License Quarter.

    d.    <u>Territory</u>: The License shall extend only to the Territory, and the use by Licensee of the Playboy Properties shall be confined to the Territory. Licensor shall have the right, but not the obligation, to terminate this Agreement by deeming any sales or distribution of the Products or use of the Playboy Properties by Licensee outside of the Territory to be an incurable default under this Agreement. Such sales of the Products or use of the Playboy Properties shall include any sales of the Products in the Territory for resale outside of the Territory. Within member states of the EU, however, Paragraph S.14. of the Schedule attached hereto is applicable. Licensee shall be free at all times during the Term to submit to Licensor a proposal to add additional countries to the Territory, but Licensor shall be under no obligation to agree to such proposal. In the event Licensor receives a bona fide offer to sell and distribute the Products to any country outside of the Territory and Licensor, in its sole discretion elects to accept such offer, it will first notify Licensee that Licensor desires to pursue such offer. Licensee must notify Licensor, within five (5) business days of receipt of Licensor's notice, of its decision whether or not to pursue negotiations with Licensor for such rights. In the event Licensee decides, in its sole discretion, not to pursue such negotiations with Licensor, Licensor may pursue such opportunity without obligation or liability to Licensee. In the event Licensee decides, in its sole discretion, to pursue such opportunity, Licensor will negotiate in good faith with Licensee for such rights. If, within thirty (30) days after Licensor's receipt of Licensee's decision to enter into such negotiations, Licensor and Licensee have not concluded an agreement, it will be conclusively presumed that the parties cannot reach an agreement and Licensor will be free to pursue such opportunities without obligation or liability to Licensee.

    e.    <u>Minimum Net Sales</u>: Notwithstanding anything in this Agreement to the contrary, if Licensee's "Net Sales" (as defined in Paragraph 2.d.(ii) hereof) in any License Year are less than those specified in Paragraph S.10. of the Schedule for such License Year (hereinafter referred to as the "Minimum Net Sales"), then Licensor shall have the right to either: (i) declare the License to be non-exclusive, thereby giving Licensor the rights to design, manufacture, advertise, promote, sell and distribute the Products in competition with Licensee or otherwise grant any or all of such rights to one or more other parties; or (ii) terminate the License and this Agreement by deeming the failure to attain the Minimum Net Sales to be an incurable default under this Agreement. Such declaration or termination: (a) shall be immediately effective upon

Exhibit A Page 52

Case 2:12-cv-10650-DSJ-JPE Doc No. 07/01/11 Filed 07/27/12 Page 50 of 50 Page ID #:309
Case 11-26046 Doc 16-1 Filed 06/27/11 Entered 06/27/11 17:30:57 Desc Exhibit
A Part 2 Page 13 of 28
Exhibit 1 pt. 1 Page 12 of 27

the receipt by Licensee of written notice from Licensor which shall be sent no later than forty-five (45) days after Licensor's receipt of the "Statement" (as defined in Paragraph 2.d.(i) hereof) for the end of each License Year and which evidences such shortfall; and (b) shall have no effect upon the amounts due and payable to Licensor for periods prior to or after such declaration or termination.

2. **COVENANTS OF LICENSEE.**

    a.   <u>Use</u>:

        (i)     Subject to Licensor's prior approval as hereinafter required, Licensee shall commence bona fide commercial sales of the Products as soon as practicable after the Commencement Date, but in no event later than April 1, 2007. If Licensee fails to commence such sales by such date, Licensor may treat such failure as a default under this Agreement. In the event during any License Year, Licensee has not on a regular and ongoing basis: (y) sold and distributed one or more of the Products within all categories of the Products under Paragraph S.6. of the Schedule; or (z) sold and distributed the Products in all countries of the Territory, then Licensor shall have the right to delete, from the Schedule upon not less than thirty (30) days' prior written notice to Licensee, any Products which, any Product category from which, or any country to which Licensee has not so sold and distributed. In the event that all Products are deleted from the Schedule or all countries are deleted from the Territory, then the License and this Agreement will automatically terminate due to an incurable default. For purposes of clarification, the sales discussed in this Paragraph 2.a.(i) are bona fide commercial sales, which are volume sales to the distribution channels listed in Paragraph S.5. of the Schedule for sale or distribution to consumers and will specifically exclude sample sales to distributors or wholesalers.

        (ii)     Licensee shall not cause or authorize any use of the Playboy Properties in any area of the world outside the Territory and shall not knowingly manufacture, sell or otherwise deal with or distribute any of the Products on behalf of or to any individual or entity that Licensee believes or has reason to believe intends or intend or is or are likely to sell, deal with or distribute any of the Products in any way outside the Territory. Within member states of the EU, however, Paragraph S.14. of the Schedule attached hereto is applicable. Licensee shall ensure that all of its distributors, whether affiliated or third-party, to which Licensee sells or through which Licensee otherwise moves any Products are aware of all Territory restrictions on the use of the Playboy Properties and the distribution of the Products and shall obtain an executed "Distributor Contract" (as defined in Paragraph 2.j.(ii) hereof) from all of its third-party distributors as set forth in Paragraph 2.j.(ii) hereof. Licensee shall immediately notify Licensor should Licensee become aware that any of its distributors, whether third-party or affiliated, have distributed or dealt with the Playboy Properties or Products in any way outside the Territory.

        (iii)     Licensee warrants and represents that it has and will continue to have throughout the Term and the "Sell-Off Period" (as defined in Paragraph 8.c. hereof) the legal right and authority to enter into this Agreement and to assume and perform its duties and obligations hereunder and that there is or are no, and Licensee shall not enter into during the Term and the Sell-Off Period any, contract, agreement or understanding with any individual or entity which would in any way restrict or prevent Licensee from the performance of its duties and obligations under this Agreement.

        (iv)     Licensee shall be responsible for obtaining, at its own expense, any and all licenses, permits and approvals (including governmental and all other licenses, permits and approvals) necessary for Licensee to: (a) design, manufacture, advertise, promote, sell and distribute the Products; (b) pay "Guaranteed Royalties" (as defined in Paragraph 2.c.(i) hereof), "Earned Royalties" (as defined in Paragraph 2.c.(ii) hereof) and taxes; and (c) fulfill any and all other duties and obligations and exercise the rights of